Sara HIPPERT, Dave Greer, Linda Markowitz, Dee Dee Larson, Ben Maas, Gregg Peppin, Randy Penrod and Charles Roulet, Individually and on Behalf of all citizens and voting residents of Minnesota similarly situated, Plaintiffs,

and

Kenneth Martin, Lynn Wilson, Timothy O'Brien, Irene Peralez, Josie Johnson, Jane Krentz, Mark Altenburg, and Debra Hasskamp, Individually and on Behalf of all citizens of Minnesota similarly situated, Plaintiffs–Intervenors,

and

Audrey Britton, David Bly, Cary Coop, and John McIntosh, Individually and on Behalf of all citizens of Minnesota similarly situated, Plaintiffs–Intervenors,

v.

Mark RITCHIE, Secretary of State of Minnesota; and Robert Hiivala, Wright County Auditor, individually and on behalf of all Minnesota county chief election officers, Defendants.

No. A11–152.

Supreme Court of Minnesota,
State of Minnesota Special
Redistricting Panel.

Feb. 21, 2012.

## FINAL ORDER ADOPTING A CONGRESSIONAL REDISTRICTING PLAN

### ORDER

On January 21, 2011, plaintiffs Sara Hippert et al. (the Hippert plaintiffs) filed this action in Wright County District Court, alleging that the current Minnesota congressional and legislative election districts are unconstitutional under the United States and Minnesota constitutions in light of the 2010 census. The Hippert plaintiffs subsequently petitioned Minnesota Supreme Court Chief Justice Lorie S. Gildea to appoint a special redistricting panel to hear and decide the case. On June 1, 2011, pursuant to her authority under Minnesota law, the Chief Justice appointed this panel and directed us to order implementation of judicially determined redistricting plans "only in the event that the Legislature and Governor have not in a timely manner enacted redistricting plans that satisfy constitutional and statutory requirements." *Hippert v. Ritchie*, No. A11–152, at 3 (Minn. June 1, 2011) (Order of Chief Justice); *see also* Minn.Stat. §§ 2.724, subd. 1, 480.16 (2010) (providing that Chief Justice has authority to assign any judge to serve and discharge duties of judge of any court).

The statutory date for completion of congressional and legislative redistricting in this decennium is February 21, 2012. *See* Minn.Stat. §§ 204B.14, subd. 1a ("It is the intention of the legislature to complete congressional and legislative redistricting activities ... in no case later than 25 weeks before the state primary election in the year ending in two."), 204D.03, subd. 1 (setting the state primary election "on the second Tuesday in August in each even-numbered year") (2010). That date has arrived, and a congressional redistricting plan has not been enacted.[1] Because the electoral process must not be delayed, the

---

1. The Governor vetoed the congressional redistricting plan passed by both houses of the Minnesota Legislature. *See* State of Minnesota, *Journal of the House*, 87th Sess. 498485 (May 23, 2011). Accordingly, that plan was never enacted into law. *See Sixty–Seventh* *Minn. State Senate v. Beens*, 406 U.S. 187, 195, 92 S.Ct. 1477, 1483, 32 L.Ed.2d 1 (1972) (stating that Governor's veto nullified Legislature's efforts to fulfill its redistricting obligations).

panel now addresses the constitutionality of Minnesota's congressional election districts.

## I.

Every ten years, following the completion of the United States Census, the seats in the United States House of Representatives are reapportioned among the states according to their respective populations. U.S. Const. art. I, § 2; *see also Wesberry v. Sanders,* 376 U.S. 1, 14, 84 S.Ct. 526, 533, 11 L.Ed.2d 481 (1964) (tracing the origins of reapportionment to the Constitutional Convention of 1787 and explaining that the United States House of Representatives "was to represent the people as individuals, and on a basis of complete equality for each voter"). Minnesota's 2010 census population of 5,303,925 entitles it to retain the eight congressional seats it has been apportioned since the 1960 census. Kristin D. Burnett, U.S. Dep't of Commerce, Econ. & Statistics Admin., U.S. Census Bureau, *Congressional Apportionment: 2010 Census Briefs* 2 (Nov. 2011) (table), http://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf.

■ The United States Constitution requires congressional election districts to be as nearly equal in population as is practicable. U.S. Const. art. I, § 2; *Wesberry,* 376 U.S. at 7–8, 84 S.Ct. at 530. Therefore, the ideal population of a Minnesota congressional district after the 2010 census is 662,991.[2] Minnesota's total population increased by 7.8 percent during the last decade, but this growth was not uniform. Hearings Before Minn. H.R. Redistricting Comm. (Marshall, Minn. Feb. 11, 2011) (testimony of Tom Gillaspy, Minnesota State Demographer). As a re-

sult, Minnesota's eight congressional districts are not equal in population. *See* Minn. Dep't of Admin., Office of Geographic & Demographic Analysis, Office of the State Demographer, *2010 Population Counts for Minnesota Congressional Districts* (Mar. 16, 2011) (table) [hereinafter *2010 Population Counts* ], http://www.demography.state.mn.us/resource.html?Id=31942. For example, the fourth congressional district is currently underpopulated by 48,367 people (a negative deviation of 7.3 percent from the ideal), and the sixth congressional district is currently overpopulated by 96,487 people (a positive deviation of 14.55 percent from the ideal). *See id.* We, therefore, hold that the population of the State of Minnesota is unconstitutionally malapportioned among the state's current congressional districts established following the 2000 census in *Zachman v. Kiffmeyer,* No. C0–01–160 (Minn. Special Redistricting Panel Mar. 19, 2002) (Final Order Adopting a Congressional Redistricting Plan).

## II.

■ The ordinary remedy for this constitutional defect is for the Minnesota Legislature to redraw the state's congressional districts to better reflect the state's population. *See* Minn. Const. art. IV, § 3 ("At its first session after each enumeration of the inhabitants of this state made by the authority of the United States, the legislature shall have the power to prescribe the bounds of congressional and legislative districts."); *Georgia v. Ashcroft,* 539 U.S. 461, 488 n. 2, 123 S.Ct. 2498, 2515 n. 2, 156 L.Ed.2d 428 (2003) ("When the decennial census numbers are released, States must redistrict to account for any

---

**2.** We calculate the ideal population for a congressional district by dividing the state's total population by eight. Because Minnesota's total population is not divisible into eight congressional districts of equal population, the ideal result is five districts with a population of 662,991 and three districts with a population of 662,990.

changes or shifts in population."). Traditional redistricting is performed through the legislative process, and the redistricting plan is enacted into law only after it is passed by the Legislature and signed by the Governor. *Beens*, 406 U.S. at 195, 92 S.Ct. at 1483.

■ The February 21, 2012 statutory deadline has arrived, and the Legislature and Governor have not enacted a congressional redistricting plan. *See* Minn.Stat. § 204B.14, subd. 1a. Therefore, it is the role of the state judicial branch to prepare a valid congressional plan and order its adoption. *See, e.g., Growe v. Emison*, 507 U.S. 25, 34, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993) (holding that the Minnesota Special Redistricting Panel's issuance of a redistricting plan, which was conditioned on the Legislature's failure to enact a constitutionally acceptable plan, is "precisely the sort of state judicial supervision of redistricting" that the United States Supreme Court has encouraged).

■ When the judicial branch performs redistricting, it lacks the political authority of the legislative and executive branches and, therefore, must act in a restrained and deliberative manner to accomplish the task. *Connor v. Finch*, 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977) (stating that courts lack the "political authoritativeness" that legislatures bring to redistricting and that a court's task "is inevitably an exposed and sensitive one that must be accomplished circumspectly, and in a manner free from any taint of arbitrariness or discrimina-

tion" (quotation omitted)); *see also Perry v. Perez*, 565 U.S. ——, ——, 132 S.Ct. 934, 941, 181 L.Ed.2d 900, —— (2012) (per curiam) (stating that "redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment" and that courts are "ill suited" to make such policy judgments). To this end, the panel has established and utilized politically neutral redistricting principles that advance the interests of the collective public good and preserve the public's confidence and perception of fairness in the redistricting process. *Hippert*, No. A11–152, at 5–7 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions). These redistricting principles include: (1) adherence to the United States Constitution, U.S. Const. art. I, § 2, amends. XIV, XV; (2) adherence to the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973–1973aa–6 (2006); (3) adherence to Minnesota's statutory requirements for congressional redistricting, such as drawing districts that comprise convenient, contiguous territory, Minn.Stat. § 2.91, subd. 2 (2010); (4) adherence to well-established redistricting principles, such as creating compact districts and preserving communities of interest;[3] and (5) drawing districts without the purpose of either protecting or defeating incumbents. *Hippert*, No. A11–152, at 5–7 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions).

---

**3.** For purposes of this redistricting principle, "communities of interest" include, but are not limited to, groups of Minnesota citizens with clearly recognizable similarities of social, geographic, political, cultural, ethnic, economic, or other interests. *Hippert*, No. A11–152, at 6 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles

and Requirements for Plan Submissions); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433, 126 S.Ct. 2594, 2618, 165 L.Ed.2d 609 (2006) (stating that "maintaining communities of interest" is a traditional redistricting principle (quotation omitted)).

The panel applied these neutral redistricting principles in performing its task. The plaintiffs to this action—the Hippert plaintiffs, plaintiffs-intervenors Kenneth Martin et al., and plaintiffs-intervenors Audrey Britton et al.—submitted proposed redistricting plans for the panel's consideration. Although certain elements from each proposed redistricting plan are reflected in the panel's congressional plan, no proposed plan was adopted in its entirety.

## III.

The panel gathered information from a variety of sources to assist it in creating new congressional districts.

The parties to this action submitted proposed redistricting criteria, and each group of plaintiffs to this action submitted proposed congressional redistricting plans for the panel's consideration. The Hippert plaintiffs' proposed plan, which reflects in substantial part the Legislature's congressional plan that the Governor vetoed, was considered on an equal footing with the proposed congressional plans of the other parties to this action.[4] Written briefs also were submitted, and the parties to this action participated in oral argument on redistricting criteria and the proposed plans.

Robust and diverse public input also informed the redistricting process. The panel received and considered the record of the Redistricting Committee of the Minnesota House of Representatives, including the transcripts of the committee's deliberations and the testimony and exhibits received by the committee during a series of statewide public hearings held in February 2011. The panel also held eight public hearings across the state in October 2011. *See Hippert*, No. A11–152, at 3–4 (Minn. Special Redistricting Panel Sept. 13, 2011) (Amended Order Setting Public Hearing Schedule). In addition to live public testimony, the panel invited and received written comments and maps from members of the public via United States Mail and e-mail. *See id.* at 5–6.

All of these sources of information were helpful in bringing to light unique features of local communities. For example, the panel received comments addressing the sovereignty and interests of federally recognized Indian tribes. *See, e.g.,* Hearings Before Minn. Special Redistricting Panel 8–12, 16–19, 39–42 (Bemidji, Minn. Oct. 11, 2011). The panel received comments on municipal annexations, regional shared educational and other governmental services, and the work of regional development commissions. *See, e.g., id.* at 17, 47 (Minneapolis, Minn. Oct. 6, 2011); 23–26, 32–36 (Bemidji, Minn. Oct. 11, 2011); 12–13 (Moorhead, Minn. Oct. 12, 2011). The panel also received comments about communities of interest that span counties, communities of interest that exist within a single county or among several county subdivisions, and communities of interest—such as neighborhoods and planning districts—that exist within a single municipality. *See, e.g., id.* at 13, 15, 26–27, 31–32, 40–41 (Bloomington, Minn. Oct. 4, 2011); 28–31, 45, 49–51, 58 (Minneapolis, Minn. Oct. 6, 2011); 9–10, 26–27 (Cloquet, Minn. Oct. 10, 2011); 11–13, 17–18, 45 (Mankato,

---

4. We observe that the United States Supreme Court recently held that a federal district court, when creating an interim congressional redistricting plan to be used during the pendency of preclearance proceedings under Section 5 of the Voting Rights Act, should defer to the redistricting plan that has been duly enacted by the state's legislative and executive branches of government. *Perry,* 565 U.S. at ——, 132 S.Ct. at 941–43. But because the Minnesota Legislature's congressional redistricting plan was never enacted into law, it is not entitled to such deference.

Minn. Oct. 14, 2011). We are heartened by and grateful for the level of civic engagement reflected in the public's participation in the hearing-and-comment process, and we favorably acknowledge the assistance provided.

## IV.

■ Because courts engaged in redistricting lack the authority to make the political decisions that the Legislature and the Governor can make through their enactment of redistricting legislation, the plan established by the panel is a least-change plan to the extent feasible. *See LaComb v. Growe,* 541 F.Supp. 145, 151 (D.Minn.1982) (stating that the "starting point" for new, court-drawn congressional districts is the last configuration of districts, "modified only to serve State policy and satisfy the constitutional mandate that one person's vote shall equal another's"). We, therefore, decline to follow the more sweeping reconfigurations of congressional districts in the plans proposed by the respective plaintiffs to this action. Rather, our adoption of a least-change congressional plan is consistent with the legal principles governing a judicially created redistricting plan and with the urgings of numerous citizens throughout Minnesota who participated in the public hearing-and-comment process.

The panel's adoption of a least-change plan also is consistent with the demographics underlying the distribution of eight districts across the state. Although Minnesota's overall population has grown and population shifts have occurred, the percentage of the state's population living in the metropolitan area and Saint Cloud has not changed dramatically. Approximately 54 percent of the state's population now lives in the traditional seven-county metropolitan area,[5] and approximately 59 percent of the state's population lives in the eleven-county "metropolitan area" defined by the Minnesota Election Law.[6] When those portions of Saint Cloud located in Benton and Stearns counties are added to the portion in Sherburne County, approximately 61 percent of the state's population—closer to five-eighths than one-half—lives in the urban, suburban, and exurban areas extending from Saint Cloud in the northwest to Dakota County in the southeast. *Cf. Zachman,* No. C0–01–160, at 4–5 (Minn. Special Redistricting Panel Mar. 19, 2002) (Final Order Adopting a Congressional Redistricting Plan) (concluding that 5:3 metropolitan-to-rural distribution of districts was warranted where eleven-county metropolitan area plus remainder of Saint Cloud totaled 59.4 percent of state's population). Accordingly, the panel's congressional plan maintains five congressional districts composed mainly of metropolitan counties and three congressional districts composed mainly of counties in greater Minnesota.

## V.

In the ten years since redistricting was last performed, two of the current congressional districts have become largely overpopulated. The second congressional district is overpopulated by 69,524 people, and the sixth congressional district is overpopulated by 96,487 people. *2010 Population Counts.* The other congressional

---

**5.** The traditional seven-county metropolitan area corresponds with the seven counties over which the Metropolitan Council has jurisdiction: Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington. *See Minn.* Stat. § 473.121, subd. 2 (2010). The cities of Han-

over, New Prague, Northfield, and Rockford, however, are excluded. *Id.*

**6.** The eleven counties are Anoka, Carver, Chisago, Dakota, Hennepin, Isanti, Ramsey, Scott, Sherburne, Washington, and Wright. *See* Minn.Stat. § 200.02, subd. 24 (2010).

districts are underpopulated to varying degrees. For example, the eighth congressional district is underpopulated by 2,649 people, but the fourth congressional district is underpopulated by 48,367 people. *Id.* The panel's task is to redraw district boundaries so that the eight congressional districts are as nearly equal in population as is practicable. Using a least-change approach, the panel made minimal adjustments to the congressional district boundaries rather than completely reconfiguring them. We now discuss each of the eight new congressional districts, in reverse numerical order.

### Eighth Congressional District

Of all the congressional districts, the eighth district requires the smallest adjustment in population. *Id.* To add the 2,649 people necessary to attain the ideal district population, the panel merely alters the preexisting split of Beltrami County. No other changes are made, and the rest of the eighth congressional district continues to follow county boundaries. The eighth congressional district continues to encompass the reservation lands of the Bois Forte Band of Chippewa, the Fond du Lac Band of Lake Superior Chippewa, the Grand Portage Band of Lake Superior Chippewa, the Leech Lake Band of Ojibwe, and the Mille Lacs Band of Ojibwe. It also continues to include the reservation lands of the Red Lake Nation that are located in Koochiching County. The district continues to keep together the communities of interest that have developed around the mining, timber, and tourism industries of northeastern Minnesota. *See, e.g.,* Hearings Before Minn. Special Redistricting Panel 32 (Cloquet, Minn. Oct. 10, 2011); 18–19, 21, 24, 35 (Bemidji, Minn. Oct. 11, 2011); 13–14, 26 (Moorhead, Minn., Oct. 12, 2011).

### Seventh Congressional District

After the 2010 census, the seventh congressional district is underpopulated by 37,479 people. *2010 Population Counts.* Limited expansion options exist. Taking population from the adjacent eighth congressional district would destabilize the population of a district that requires very little adjustment after the census. Another option, more consistent with the panel's least-change approach, would add all or part of Saint Cloud to the seventh congressional district. The panel did not receive any arguments from the parties to this action, public comment, or data demonstrating that the city of Saint Cloud's interests are aligned with the agriculturally based seventh congressional district. *See, e.g.,* Hearings Before Minn. Special Redistricting Panel 18–19, 21 (Bemidji, Minn. Oct. 11, 2011); 13–14, 25 (Moorhead, Minn. Oct. 12, 2011) (describing the current seventh congressional district as agriculturally based). By contrast, portions of Saint Cloud are located in Sherburne County, which is part of the eleven-county metropolitan area, and Saint Cloud shares the interests of the exurban communities to its east. *See* Minn.Stat. § 200.02, subd. 24 (defining eleven-county metropolitan area). The panel therefore expands the seventh congressional district southward by approximately 25 miles, adding Pipestone, Murray, and part of Cottonwood counties from the first congressional district. These counties are served by the same judicial district and regional development commission as the southernmost counties in the current seventh congressional district. *See* Minn. Judicial Branch, *Minnesota District Courts* (map of judicial districts), http://www.mncourts.gov/?page= 238; *Minnesota Regional Development Commissions* (map), http://www.mrdo.org. They also share the agricultural interests that largely define the balance of the seventh congressional district. *See, e.g.,*

Hearings Before Minn. H.R. Redistricting Comm. (Marshall, Minn. Feb. 11, 2011) (testimony of Professor Anthony Amato, Chair, Department of Rural and Regional Studies, Southwest Minnesota State University) (characterizing agriculture as the backbone of southwestern Minnesota). To achieve the ideal population in the seventh congressional district, the panel also alters the preexisting splits of Beltrami County (with the eighth congressional district) and Stearns County (with the sixth congressional district). In the north, the seventh congressional district continues to encompass the reservation lands of the White Earth Nation and most of the reservation lands of the Red Lake Nation.[7] Along the Minnesota River, the seventh congressional district continues to encompass the reservation lands of the Lower Sioux Indian Community and the Upper Sioux Community.

### Sixth Congressional District

The sixth congressional district established after the 2000 census in *Zachman* is overpopulated by 96,487 people. It includes the eastern part of Stearns County, all of Benton, Sherburne, and Wright counties, and portions of Anoka and Washington counties. In altering the boundaries of the sixth congressional district, the panel adds portions of Carver County that have interests similar to adjacent Wright County, which remains entirely within the sixth congressional district. *See, e.g.,* Minn.Stat. § 200.02, subd. 24 (defining eleven-county metropolitan area to include Carver and Wright counties).

The panel also alters the preexisting split of Stearns County to achieve population equality, but the split continues to respect the differences between the rural, western part of the county (which the panel places within the seventh congressional district) and the eastern part of the county, which includes Saint Cloud and its surrounding communities of interest. *See Stearns County Comprehensive Plan* 1–1 (Mar.2008) (describing difference in land use between western and eastern Stearns County), http://www.co.stearns.mn.us/Portals/0/docs/CompPlan/CompPlan01Intro.pdf.

According to the public comments that the panel received from residents of the sixth congressional district, the existing district contains at least two disparate communities of interest that are also geographically remote from one another: (1) Saint Cloud and (2) Stillwater and other Washington County cities and townships located on the Saint Croix River. These members of the public overwhelmingly urged that the sixth congressional district be reconfigured to encompass only one of these communities of interest; no member of the public involved in the panel's public hearing-and-comment process requested to keep Saint Cloud and Stillwater together. *See, e.g.,* Hearings Before Minn. Special Redistricting Panel 12–13 (Bloomington, Minn. Oct. 4, 2011); 19, 21–22, 36 (Saint Paul, Minn. Oct. 5, 2011). In addition, residents of the east metropolitan area extending from the Saint Croix River to Woodbury described their community of interest as Saint Paul and its eastern suburbs. *See, e.g., id.* at 13–14 (Bloomington, Minn. Oct. 4, 2011); 21–22, 36–37, 46–47 (Saint Paul, Minn. Oct. 5, 2011). To adjust the boundaries of the sixth congressional district, the panel removes the portions of Washington County that share interests with the east metropolitan area and places them in the new fourth congressional district, which, as discussed below, is 48,367 people below the ideal district population

---

7. The reservation lands of the Red Lake Nation that are located in Koochiching County remain within the eighth congressional district.

following the 2010 census. The sixth congressional district retains its suburban and exurban character but no longer encompasses both Saint Cloud and the Saint Croix River communities that are more connected to the east metropolitan area.

### Fifth and Fourth Congressional Districts

The fifth and fourth congressional districts are the state's two core urban districts, centered in Minneapolis and Saint Paul, respectively. After the 2010 census, these districts are underpopulated by 46,-509 and 48,367 people, respectively. *2010 Population Counts*. Because Minneapolis and Saint Paul are distinct communities of interest, the *Zachman* panel rejected the proposal that the two cities should be combined. *Zachman*, No. C0–01–160, at 7–9 (Minn. Special Redistricting Panel Mar. 19, 2002) (Final Order Adopting a Congressional Redistricting Plan). Not one of the parties to this action or any of the testimony and exhibits received through the public hearing-and-comment process suggested combining these two cities. We concur in the *Zachman* panel's determination. Accordingly, consistent with the least-change objective, the panel maintains distinct congressional districts for Minneapolis and Saint Paul.

The fifth congressional district continues to be centered on Minneapolis and includes all or part of every municipality in Anoka and Hennepin counties that shares a border with Minneapolis. Only one split of a city is necessary to achieve population equality, and this split is accomplished primarily by using major roads.

The fourth congressional district continues to be centered on Saint Paul. As with the Minneapolis-centered fifth congressional district, the fourth congressional district needs to expand to achieve population equality. The panel also is mindful of addressing the concerns of the public regarding the adjacent sixth congressional district. Consequently, the options for expanding the fourth congressional district and addressing the concerns identified with the sixth congressional district are limited. The fourth congressional district cannot expand west without encroaching on the Minneapolis-centered fifth congressional district. The panel declines to do so, observing that Minneapolis and Saint Paul have been in separate congressional districts since 1891. *Id.* at 7. Southward expansion by adding population from Dakota County would have no impact on the overpopulation of the sixth congressional district. And northward expansion by adding population from Anoka County would decrease the sixth congressional district's compactness by cutting into its middle, while failing to respond to the public input regarding the sixth district's disparate communities of interest.

To address this conundrum, the panel extends the fourth congressional district eastward to the Saint Croix River, bounded on the north and south by two parallel lines running through Washington County that correspond with boundary lines between cities and townships. In doing so, the panel adds whole political subdivisions from Washington County and alters the preexisting split of Saint Paul Park to achieve population equality.[8] The new fourth congressional district is compact.

---

**8.** The new fourth congressional district also splits Blaine and Spring Lake Park, both of which straddle county lines. *See* Letter from Patty O'Connor & Debby Erickson, Co-chairs, Minn. County Auditors' Election Comm., to Minn. Special Redistricting Panel, at 2 (Oct. 20, 2011) (recommending that county boundaries be used as district boundaries when a city is divided by a county boundary). The small part of Blaine located in Ramsey County and placed in the fourth congressional district contains no population.

*See* App'x D.[9] It also is convenient. The communities on the Saint Croix River are connected to the east metropolitan area by thoroughfares such as Interstate Highway 94 and Minnesota State Highway 36. The new fourth congressional district is responsive to the public comments and consistent with the fair application of the neutral redistricting principles.

### Third Congressional District

The existing third congressional district, which consists of greater Hennepin County and part of Coon Rapids (Anoka County), is underpopulated by 12,806 people. In the existing district, Coon Rapids is split. The panel unifies the city within the third congressional district. The panel also adds the Carver County municipalities of Chanhassen, Chaska, Victoria, Laketown, and a portion of Dahlgren. These municipalities are connected to the west metropolitan area by several thoroughfares and are under the jurisdiction of the Metropolitan Council. *See* Minn.Stat. § 200.02, subd. 24. This decision responds to the public input that the residents of northeastern Carver County share common issues and interests with the residents of other west metropolitan suburbs. *See, e.g.,* Hearings Before Minn. Special Redistricting Panel 16–17 (Bloomington, Minn. Oct. 4, 2011).

### Second Congressional District

The new second congressional district, which is presently overpopulated by 69,524 people, no longer includes Carver County (which the panel splits between the third and sixth congressional districts). Rather, the district's western border follows the

Minnesota River, which also serves as the western border of Scott County. The new second congressional district gains all of Wabasha County from the first congressional district, in exchange for all of Le Sueur County and part of Rice County. Unlike its southern neighbors of Olmsted and Winona counties, Wabasha County is not conveniently connected to the first congressional district by Interstate Highway 90. Rice County, however, is connected to the first congressional district by Interstate Highway 35. In splitting Rice County to achieve population equality, the panel splits only one township and keeps the cities of Northfield and Faribault intact. The new second congressional district continues to encompass the reservation lands of the Prairie Island Indian Community and the Shakopee Mdewakanton Sioux Community.

### First Congressional District

Consistent with the panel's least-change approach, the new first congressional district, which is underpopulated by 18,204 people, continues to extend across the southern border of Minnesota and remains internally connected by Interstate Highway 90. *See Zachman,* No. C0–01–160, at 5–6 (Minn. Special Redistricting Panel Mar. 19, 2002) (Final Order Adopting a Congressional Redistricting Plan) (explaining that a district along the state's southern border is convenient because of Interstate Highway 90). To achieve population equality in the first and seventh congressional districts, the first district no longer encompasses the western counties of Pipestone, Murray, and part of Cottonwood. But it retains its largely rural character.

---

9. The reports appended to this order were either produced using the most recent version of Maptitude for Redistricting (Maptitude) available to the panel (Version 6.0 Build 975) or were produced using data generated by that software. *See Hippert,* No. A11–152, at 4, 12–13 (Minn. Special Redistricting Panel Nov.

4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions) (specifying software to be used by the panel and reports to be submitted by the parties to this action). [Editor's Note: Appendix D omitted for purposes of publication.]

The new first congressional district also retains its two largest cities—Rochester and Mankato—and their respective surrounding areas. It continues to encompass the reservation lands of the Ho–Chunk Nation.

These eight congressional districts satisfy all of the redistricting criteria set forth in the panel's November 4, 2011 order. They are as nearly equal in population as possible. These congressional districts were not drawn with either the purpose or effect of denying or abridging the voting rights of any United States citizen on account of race, ethnicity, or membership in a language minority group.[10] They otherwise comply with the United States Constitution and the Voting Rights Act. *See* U.S. Const. art. I, § 2, amends. XIV, XV; 42 U.S.C. §§ 1973–1973aa–6. They comprise convenient, contiguous territory structured into compact units.[11] *See* Minn. Stat. § 2.91, subd. 2; *Shaw v. Reno*, 509 U.S. 630, 646, 113 S.Ct. 2816, 2826, 125 L.Ed.2d 511 (1993). Political subdivisions are not divided more than necessary to meet constitutional requirements.[12] These districts also respect the reservation boundaries of federally recognized Indian tribes. Additionally, when doing so does not abridge other redistricting criteria, the new districts accommodate communities of interest.

■ Finally, "[c]ongressional districts shall not be drawn for the purpose of protecting or defeating incumbents." *Hippert*, No. A11–152, at 7 (Minn. Special Redistricting Panel Nov. 4, 2011) (Order Stating Redistricting Principles and Requirements for Plan Submissions). But as a factor subordinate to all redistricting criteria, the panel may consider the impact of redistricting on incumbent officeholders to determine whether a plan results in either undue incumbent protection or excessive incumbent conflicts. *Id.* Neither result exists here.

■ We are mindful that the new configuration of the fourth and sixth con-

---

10. Minnesota's minority populations have experienced substantial growth during the past decade. *See* U.S. Census Bureau, *2010 Census Results: Minnesota* (chart of state population change by race), http://www.demography.state.mn.us/Census2010/; *see also, e.g.,* Hearings Before Minn. Special Redistricting Panel 10, 33, 39 (Saint Paul, Minn. Oct. 5, 2011); 20, 23–24, 42, 52–53 (Minneapolis, Minn. Oct. 6, 2011); 35 (Mankato, Minn. Oct. 14, 2011). The increase in Minnesota's minority populations is reflected in the racial composition of this congressional plan's districts. Each new congressional district has a higher minority-population percentage—both as a percentage of the total population and as a percentage of the voting-age population—than the corresponding congressional district adopted in *Zachman* ten years ago. *See* App'x G. [Editor's Note: Appendix G omitted for purposes of publication.]

11. This congressional redistricting plan is more compact than the three proposed plans submitted by the parties to this action. On five of the eight compactness measures adopted by the panel in its November 4, 2011 order, this redistricting plan achieves the best compactness scores. *See* App'x F. [Editor's Note: Appendix F omitted for purposes of publication.] In addition, this congressional redistricting plan is equal to or more compact than all of the proposed plans on a sixth measure of compactness. *Id.* On the remaining two measures, this redistricting plan is only slightly less compact than the parties' proposed plans. *Id.*

12. This congressional redistricting plan splits nine counties, which is only slightly more than any plan proposed by the parties to this action. *See* App'xs E–F. [Editor's Note: Appendices E–F omitted for purposes of publication.] The interests of Saint Cloud and Saint Anthony are better served by keeping those cities intact in one congressional district than by splitting them on county lines. The panel's decision to do so also is consistent with the corresponding congressional districts adopted in *Zachman* ten years ago. (When a city or township is split on a county boundary, Maptitude does not count it as a split.)

gressional districts presents an incumbent conflict.[13] Indeed, the congressional plan established by the *Zachman* panel following the 2000 census resulted in a conflict among male incumbents involving the second and sixth congressional districts. Here, two female incumbents of different political parties reside in one district, and an open seat results in another. Minnesota's experience of fielding female candidates has resulted in the election of women to national, state, and local office. The circumstance here does not present a diminution of opportunity for voters to build on Minnesota's history of electing female representatives.[14] The constitutional purpose of congressional redistricting is to establish election districts of equal population so that each Minnesotan has equal voting power when selecting a representative.[15] Applying neutral redistricting principles, we have done so.

■ We observe that in a constitutional democracy, congressional districts do not exist for the benefit of any particular legislator. Neither do those districts exist for the benefit of any political party. Rather, congressional districts exist for the people to select their representatives.[16] The single incumbent conflict that exists is not just cause to abandon a congressional redistricting plan that satisfies the United States Constitution, the Minnesota Constitution, the statutory requirements for redistricting, and traditional redistricting criteria and that advances the interests of the collective public good.

## VI.

Because the existing congressional districts are unconstitutional for purposes of the 2012 primary and general elections, we enjoin their use in these elections and hereby adopt the congressional boundaries set forth in Appendices A and H to this order.■ Defendants shall conduct elections utilizing the congressional districts adopted in this order or any constitutional congressional plan subsequently enacted by the Minnesota Legislature and the Governor of the State of Minnesota.[17]

BY THE PANEL:

/s/Wilhelmina M. Wright
Presiding Judge

/s/Ivy S. Bernhardson

/s/Edward I. Lynch

/s/James B. Florey

/s/John R. Rodenberg

---

13. This analysis is based on publicly available data.

14. In Minnesota's 2010 general election, six women were on the ballot for congressional office. Two of these candidates ran in the fourth congressional district, two ran in the sixth congressional district, one ran in the second congressional district, and one ran in the fifth congressional district.

15. *See Wesberry*, 376 U.S. at 13–14, 84 S.Ct. at 533 (stating that the United States Constitution embodies the requirement for redistricting after a periodic census to ensure that the number of inhabitants "should always be the measure of representation in the House of Representatives").

16. The Federalist No. 57, at 391 (James Madison, Feb. 19, 1788) (reprinted in M. Walter Dunne 1901) ("[T]he House of Representatives is so constituted as to support in the members an habitual recollection of their dependence on the people.")

17. Secretary of State Mark Ritchie is hereby provided a block-equivalency file and a copy of this order to facilitate the implementation of this congressional plan. Should any ambiguity arise regarding the plan set forth in this order, the Secretary of State is directed to act in accordance with Minn.Stat. §§ 2.91, subds. 2–3, 204B.146, subd. 3 (2010).

## APPENDIX A

2012 Minnesota Special Redistricting Panel
Minnesota Congressional Districts - State Map
February 21, 2012

2012 Congressional District
County
Indian Reservation
Interstate

2012 Minnesota Special Redistricting Panel
Minnesota Congressional Districts - 2002 and 2012 Comparison
February 21, 2012

2012 Congressional District
2002 Congressional District
County
Indian Reservation
Interstate

2012 Minnesota Special Redistricting Panel
Minnesota Congressional Districts - Metropolitan Area
February 21, 2012

2012 Minnesota Special Redistricting Panel
Minnesota Congressional Districts - 2012 and 2002 Comparison
Greater Metro Area