# SUPREME COURT OF THE UNITED STATES

_____

No. 21A471

_____

## WISCONSIN LEGISLATURE, ET AL. *v.* WISCONSIN ELECTIONS COMMISSION, ET AL.

### ON APPLICATION FOR STAY AND INJUNCTIVE RELIEF

[March 23, 2022]

PER CURIAM.

Because of population shifts revealed by the 2020 decennial census, Wisconsin's State Assembly and Senate districts are no longer equally apportioned. The Wisconsin Legislature passed new maps to fix the problem, but the Governor vetoed them. At an impasse, the legislature and the Governor turned to the Wisconsin Supreme Court, which had already agreed to hear an original action brought by a group of voters seeking to remedy the malapportionment. Rather than attempt to draw new maps itself, the court invited the parties and intervenors—including the legislature and the Governor—to propose maps that complied with the State Constitution, the Federal Constitution, and the Voting Rights Act of 1965 (VRA), 79 Stat. 437, as amended, 52 U. S. C. §10301 *et seq.*, and that otherwise minimized changes from the current maps.

On March 3, the court issued a decision selecting the Assembly and Senate maps that the Governor had proposed. *Johnson* v. *Wisconsin Elections Comm'n*, 2022 WI 14, ___ Wis. 2d ___, ___ N. W. 2d ___. (Because the State Constitution requires three Assembly districts to be nested within each Senate district, the court analyzed and selected the maps as a unit. *Id.*, ¶26.) The Governor's Assembly map intentionally created seven majority-black districts—one more than the current map.[1] The Governor argued that the

_____

[1] The Governor's map accomplished this addition by reducing the black voting-age population in the other six majority-black districts. The black

addition of a seventh majority-black district was necessary for compliance with the VRA. In adopting the Governor's map, the court explained: "[W]e cannot say for certain on this record that seven majority-Black assembly districts are required by the VRA." *Id.*, ¶47. It nevertheless concluded that the Governor's map complied with the Equal Protection Clause of the Fourteenth Amendment because there were "good reasons" to think that the VRA "may" require the additional majority-black district. *Id.*, ¶50.

The legislature and the voters who initiated the state-court proceeding now seek relief from that decision. They argue that the court selected race-based maps without sufficient justification, in violation of the Equal Protection Clause. They ask this Court either to grant an emergency stay or to construe their application as a petition for certiorari and reverse the decision below.

We agree that the court committed legal error in its application of decisions of this Court regarding the relationship between the constitutional guarantee of equal protection and the VRA. We accordingly construe the application for stay presented to JUSTICE BARRETT and by her referred to the Court as a petition for certiorari, grant the petition, reverse the imposition of the Governor's State Assembly and Senate maps, and remand to the Wisconsin Supreme Court for proceedings not inconsistent with this opinion. Summarily correcting the error gives the court sufficient time to adopt maps consistent with the timetable for Wisconsin's August 9th primary election.

* * *

Under the Equal Protection Clause, districting maps that sort voters on the basis of race "'are by their very nature odious.'" *Shaw* v. *Reno*, 509 U. S. 630, 643 (1993). Such

_____

voting-age populations in the Governor's seven districts all cluster between 50.1% and 51.4%, compared to the current six districts' range of 51% to 62%. See 2022 WI 14, ¶87 (Ziegler, C. J., dissenting).

laws "cannot be upheld unless they are narrowly tailored to achieving a compelling state interest." *Miller* v. *Johnson*, 515 U. S. 900, 904 (1995). We have assumed that complying with the VRA is a compelling interest. *Cooper* v. *Harris*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 2). And we have held that if race is the predominant factor motivating the placement of voters in or out of a particular district, the State bears the burden of showing that the design of that district withstands strict scrutiny. *Ibid.* Thus, our precedents hold that a State can satisfy strict scrutiny if it proves that its race-based sorting of voters is narrowly tailored to comply with the VRA. *Ibid.*

A State violates §2 of the VRA "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U. S. C. §10301(b). We have construed §2 to prohibit the distribution of minority voters into districts in a way that dilutes their voting power. See *Thornburg* v. *Gingles*, 478 U. S. 30, 46–51 (1986). In *Gingles*, we provided a framework for demonstrating a violation of that sort. First, three "preconditions" must be shown: (1) The minority group must be sufficiently large and compact to constitute a majority in a reasonably configured district, (2) the minority group must be politically cohesive, and (3) a majority group must vote sufficiently as a bloc to enable it to usually defeat the minority group's preferred candidate. *Id.*, at 50–51.

If the preconditions are established, a court considers the totality of circumstances to determine "whether the political process is equally open to minority voters." *Id.*, at 79; see also *Johnson* v. *De Grandy*, 512 U. S. 997, 1011–1012 (1994) (satisfying the *Gingles* preconditions is necessary

but not sufficient to show a §2 violation; "courts must also examine other evidence in the totality of circumstances"). We have identified as relevant to the totality analysis several factors enumerated in the Senate Report on the 1982 amendments to the VRA, as well as "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 426 (2006) (*LULAC*).

We said in *Cooper* that when a State invokes §2 to justify race-based districting, "it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." 581 U. S., at ___ (slip op., at 3). The Wisconsin Supreme Court concluded that the Governor's intentional addition of a seventh majority-black district triggered the Equal Protection Clause and that *Cooper*'s strict-scrutiny test must accordingly be satisfied. Accepting those conclusions, we hold that the court erred in its efforts to apply *Cooper*'s understanding of what the Equal Protection Clause requires.

It is not clear whether the court viewed the Governor or itself as the state mapmaker who must satisfy strict scrutiny, but the court's application of *Cooper* was flawed either way. If the former, the Governor failed to carry his burden. His main explanation for drawing the seventh majority-black district was that there is now a sufficiently large and compact population of black residents to fill it, Brief for Intervenor-Respondent Evers in *Johnson* v. *Wisconsin Elections Comm'n*, No. 2021AP1450–OA (Wis. Sup. Ct., Dec. 15, 2021), p. 14—apparently embracing just the sort of uncritical majority-minority district maximization that we have expressly rejected. *De Grandy*, 512 U. S., at 1017 ("Failure to maximize cannot be the measure of §2"). He provided almost no other evidence or analysis supporting his claim that the VRA required the seven majority-black districts that he drew. See 2022 WI 14, ¶¶90–91, 103–107 (Ziegler,

C. J., dissenting). Strict scrutiny requires much more. See *Abbott* v. *Perez*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 40) ("[W]here we have accepted a State's 'good reasons' for using race in drawing district lines, the State made a strong showing of a pre-enactment analysis with justifiable conclusions"). If the Wisconsin Supreme Court was reviewing whether the Governor satisfied strict scrutiny, it erred by adopting his maps.

If, on the other hand, the court sought to shoulder strict scrutiny's burden itself, it fared little better. *First*, it misunderstood *Cooper*'s inquiry. The court believed that it had to conclude only that the VRA *might* support race-based districting—not that the statute required it. See 2022 WI 14, ¶¶47, 50 ("[W]e cannot say for certain on this record that seven majority-Black assembly districts are required by the VRA," but "we see good reasons to conclude a seventh majority-Black assembly district *may* be required" (emphasis added)). Our precedent instructs otherwise. Thus in *Cooper* we explained, for example, that "race-based districting is narrowly tailored . . . if a State had 'good reasons' for thinking that the Act *demanded* such steps." 581 U. S., at \_\_\_ (slip op., at 12) (emphasis added). And we concluded that "experience gave the State no reason to think that the VRA *required*" it to move voters based on race. *Id.*, at \_\_\_ (slip op., at 14) (emphasis added). That principle grew out of the more general proposition that "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was *necessary*, '*before* it embarks on an affirmative-action program.'" *Shaw* v. *Hunt*, 517 U. S. 899, 910 (1996) (some emphasis added).

To be sure, we said in *Cooper* that States have "'breathing room'" to make reasonable mistakes; we will not fault a State just because its "compliance measures . . . may prove, in perfect hindsight, not to have been needed." 581 U. S., at \_\_\_ (slip op., at 3). But that "leeway" does not allow a

State to adopt a racial gerrymander that the State does not, at the time of imposition, "judg[e] necessary under a proper interpretation of the VRA." *Id.*, at ___ (slip op., at 17).

*Second*, the court's analysis of *Gingles'* preconditions fell short of our standards. As we explained in *Cooper*, "[t]o have a strong basis in evidence to conclude that §2 demands . . . race-based steps, the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions . . . in a new district created without those measures." 581 U. S., at ___ (slip op., at 15). Rather than carefully evaluating evidence at the district level, the court improperly relied on generalizations to reach the conclusion that the preconditions were satisfied. See *id.*, at ___, n. 5 (slip op., at 16, n. 5) (a "generalized conclusion fails to meaningfully . . . address the relevant local question" whether the preconditions would be satisfied as to each district).

The court's entire discussion of the first precondition was to say that "it is undisputed" and "the parties' submissions demonstrate" that seven sufficiently large and compact majority-black districts could be drawn. 2022 WI 14, ¶43. Similarly, its discussion of the second precondition consisted of nothing but the statement that "[e]xperts from multiple parties analyzed voting trends and concluded political cohesion existed; no party disagreed." *Id.*, ¶44. And while the court did cite one specific expert report for the third precondition—calculating, based on eight previous races, how often white voters in the Milwaukee area defeat the preferred candidate of black voters—it made virtually no effort to parse that data at the district level or respond to criticisms of the expert's analysis. *Id.*, ¶45; see *id.*, ¶¶108–111 (Ziegler, C. J., dissenting).[2]

——————

[2] That sole piece of cited record evidence came from an intervenor who argued that the Governor's map *violated* the VRA. See 2022 WI 14, ¶¶91, 112 (Ziegler, C. J., dissenting); Response Brief for Intervenor-Petitioner Black Leaders Organizing for Communities et al. in *Johnson* v. *Wisconsin Elections Comm'n*, No. 2021AP1450–OA (Wis. Sup. Ct., Dec. 30, 2021), pp. 7–20. The court did not acknowledge or respond to that argument.

*Third*, the court improperly reduced *Gingles'* totality-of-circumstances analysis to a single factor. The court acknowledged the Senate factors but concluded that they had no role to play in its analysis. 2022 WI 14, ¶46, and n. 28. Instead, it focused exclusively on proportionality. See *id.*, ¶¶46–50. We rejected just that approach in *De Grandy*, explaining that "[n]o single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength." 512 U. S., at 1020–1021; see also *id.*, at 1026 (O'Connor, J., concurring) ("The Court . . . makes clear that proportionality is never dispositive. Lack of proportionality can never by itself prove dilution, for courts must always carefully and searchingly review the totality of the circumstances").

The question that our VRA precedents ask and the court failed to answer is whether a race-neutral alternative that did not add a seventh majority-black district would deny black voters equal political opportunity. Answering that question requires an "'"intensely local appraisal"'" of the challenged district." *LULAC*, 548 U. S., at 437. When the Wisconsin Supreme Court endeavored to undertake a full strict-scrutiny analysis, it did not do so properly under our precedents, and its judgment cannot stand.

*      *      *

The judgment of the Supreme Court of Wisconsin is reversed as to the selection of the Governor's State Assembly and Senate maps, and the case is remanded for further proceedings not inconsistent with this opinion. On remand, the court is free to take additional evidence if it prefers to reconsider the Governor's maps rather than choose from among the other submissions. Any new analysis, however, must comply with our equal protection jurisprudence.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 21A471

―――――――

## WISCONSIN LEGISLATURE, ET AL. *v.* WISCONSIN ELECTIONS COMMISSION, ET AL.

### ON APPLICATION FOR STAY AND INJUNCTIVE RELIEF

[March 23, 2022]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins, dissenting.

The Court's action today is unprecedented. In an emergency posture, the Court summarily overturns a Wisconsin Supreme Court decision resolving a conflict over the State's redistricting, a decision rendered after a 5-month process involving all interested stakeholders. Despite the fact that summary reversals are generally reserved for decisions in violation of settled law, the Court today faults the State Supreme Court for its failure to comply with an obligation that, under existing precedent, is hazy at best.

When the Wisconsin Legislature and executive were unable to agree on reapportioned electoral maps following the 2020 census, the Wisconsin Supreme Court granted a voter petition to ensure that maps were in place before the 2022 elections. The court announced the criteria that it would use to select maps (namely, that it would seek to minimize changes from the 2011 maps while accounting for population shifts) and permitted any party to intervene and submit maps for consideration. See *Johnson* v. *Wisconsin Elections Comm'n*, 2021 WI 87, ¶81, 399 Wis. 2d 623, 671, 967 N. W. 2d 469, 493.[1] The court ultimately rejected the State Assembly map submitted by the Wisconsin Legislature (applicants here) in favor of the map submitted by the Governor because it found the Governor's map "vastly superior" under its announced "least change" criteria. *Johnson* v.

―――――――

[1] Before this Court, applicants do not challenge this process.

*Wisconsin Elections Comm'n*, 2022 WI 14, ¶¶26, 29, ___
Wis. 2d ___, ___, ___ N. W. 2d ___, ___, ___.

The court proceeded to a preliminary analysis of whether
the Equal Protection Clause or the Voting Rights Act of
1965 (VRA) precluded it from adopting the Governor's map,
which increased the number of majority-Black Assembly
districts in Milwaukee from six to seven based on changes
in population.[2]  The court noted that the parties before it
had all "appeared to assume the VRA requires at least some
majority-Black districts in the Milwaukee area" and that
there had been no dispute that the preconditions in *Thorn-
burg* v. *Gingles,* 478 U. S. 30 (1986) (for assessing whether
race-conscious districting is required in order to avoid dilut-
ing minority voting power) were satisfied, aside from an un-
developed reference at oral argument.  2022 WI 14, ¶45.
The court stressed, however, that no Equal Protection
Clause or VRA claim was before it and that adjudicating
such claims would require a fuller record and a closer as-
sessment.  It concluded that neither the Equal Protection
Clause nor the VRA clearly foreclosed adopting the Gover-
nor's map in the first instance, *id.,* ¶47, but left open the
possibility that a "standard VRA claim" could be "brought
after the adoption of new districts," *id.,* ¶41, n. 24.

Applicants now assert that the Wisconsin Supreme Court
misapplied this Court's precedents in its preliminary as-
sessment of whether the Governor's map violated the Equal
Protection Clause.  The Court agrees and summarily re-
verses.  In doing so, however, the Court assumes the an-
swers to multiple questions that our precedent leaves un-
certain.

In its brief discussion of equal protection and the VRA,

_____

[2] The court found that the Black voting age population in the Milwau-
kee area had increased 5.5% since the last census, while the White voting
age population had decreased 9.5%.  2022 WI 14, ¶48.

the Wisconsin Supreme Court presumed that the framework summarized in this Court's decision in *Cooper* v. *Harris*, 581 U. S. \_\_\_ (2017), governed in this posture. The Court tacitly accepts that assumption. *Ante*, at 4. *Cooper*, however, arose in a starkly different posture. *Cooper* outlines the specific, burden-shifting procedure for adjudicating claims brought under the Equal Protection Clause "[w]hen a voter sues state officials for drawing . . . race-based lines." 581 U. S., at \_\_\_ (slip. op., at 2). That framework requires that the plaintiff first "prove that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Ibid.* (internal quotation marks omitted). If the court finds that "racial considerations predominated over others," the burden then "shifts to the State to prove that its race-based sorting of voters" satisfies strict scrutiny. *Ibid.* The State can meet that burden by showing that "it had a strong basis in evidence" for concluding that the VRA required its actions, a standard that "gives States breathing room to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Id.,* at \_\_\_ (slip op., at 3) (internal quotation marks omitted).[3] It is far from clear whether this burden-shifting framework should also apply in the unusual circumstance where, as here, a state court is adopting a map in the first instance with no Equal Protection Clause claim before it.

Even accepting the assumption that this framework controls, it remains unclear how a court in the posture below should apply it. Again, the Wisconsin Supreme Court was selecting a map itself, not adjudicating a subsequent chal-

---

[3] The other precedents on which the Court relies arose in analogous postures. See *Abbott* v. *Perez*, 585 U. S. \_\_\_ (2018); *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399 (2006); *Shaw* v. *Hunt*, 517 U. S. 899 (1996); *Johnson* v. *De Grandy*, 512 U. S. 997 (1994); *Thornburg* v. *Gingles*, 478 U. S. 30 (1986).

lenge in the manner that *Cooper* and other cases have ad-
dressed.  The court accepted an original action to supervise
the redistricting and, with the input of the parties, designed
its own process for doing so: accepting proposed maps from
litigants rather than "craft[ing its] own map" and determin-
ing to "choose the maps that best conform[ed] with [its] di-
rectives," even if those maps were "imperfect," rather than
"modify[ing]" the lines they drew.  2022 WI 14, ¶¶4, 6.  Alt-
hough the Governor reported that he considered race in
drawing his Assembly map, the Wisconsin Supreme Court
selected the Governor's map because it scored best on a
race-neutral "least change" metric.  *Id.,* ¶8.  Our precedents
offer no clear answers to the question whose motives should
be analyzed in these circumstances (the four justices who
selected the map based on the "least change" criteria, the
Governor, or some combination) or how.  The Court does not
purport to answer this question.

The Court also faults the Wisconsin Supreme Court for
failing to scrutinize each of the *Gingles* preconditions inde-
pendently after the parties agreed that some majority-
Black districts needed to be drawn in Milwaukee.  *Ante,* at
6–7.[4]  But courts generally are not mandated to investigate
"'undisputed'" and nonjurisdictional issues.  *Ante,* at 6.  The
Court points to no precedent requiring a court conducting a
malapportionment analysis to embark on an independent
inquiry into matters that the parties have conceded or not
contested, like the *Gingles* preconditions here.

This Court's intervention today is not only extraordinary
but also unnecessary.  The Wisconsin Supreme Court
rightly preserved the possibility that an appropriate plain-
tiff could bring an equal protection or VRA challenge in the

—————
[4] Applicants proposed a map with five majority-Black districts and a
sixth with less than a majority.  The court below noted concern that ap-
plicants' map might violate the VRA by "packing" minority voters into a
"small number of districts to minimize their influence in the districts
next door."  2022 WI 14, ¶49 (internal quotation marks omitted).

proper forum. 2022 WI 14, ¶41, n. 24. I would allow that process to unfold, rather than further complicating these proceedings with legal confusion through a summary reversal. I respectfully dissent.