NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Original
No. 2022-0184


THERESA NORELLI & a.

v.

SECRETARY OF STATE & a.

Argued: May 4, 2022
Opinion Issued: May 12, 2022


McLane Middleton, P.A., of Manchester (Steven J. Dutton on the brief), Paul Twomey, of Epsom, on the brief, Elias Law Group LLP, of Seattle, Washington (Abha Khanna and Jonathan P. Hawley on the brief), Elias Law Group LLP, of Washington, D.C. (Aaron M. Mukerjee on the brief), and Perkins Coie LLP, of Washington, D.C. (John Devaney on the brief and orally), for the plaintiffs.

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Myles B. Matteson, assistant attorney general, Anne M. Edwards, associate attorney general, and Matthew G. Conley, attorney, on the joint brief, and Myles B. Matteson orally), for the Secretary of State and John M. Formella,

attorney general, and Anthony J. Galdieri, solicitor general (Samuel R.V. Garland, senior assistant attorney general, on the joint brief and orally), for the State of New Hampshire.

Lehmann Major List, PLLC, of Concord (Sean R. List on the joint brief and orally), for the Speaker of the New Hampshire House of Representatives and (Richard J. Lehmann on the joint brief and orally), for the President of the New Hampshire Senate.

Shaheen & Gordon, P.A., of Concord (James J. Armillay, Jr., S. Amy Spencer, and Olivia Bensinger on the memorandum of law), for the New Hampshire Senate Minority Leader and the New Hampshire House of Representatives Minority Leader, as amici curiae.

American Civil Liberties Union of New Hampshire Foundation, of Concord (Gilles R. Bissonnette and Henry R. Klementowicz on the brief, and Henry R. Klementowicz orally), as amicus curiae.

PER CURIAM. This case raises two preliminary questions. First, whether the current statute establishing a district plan for New Hampshire's two congressional districts, see RSA 662:1 (2016), violates Article I, Section 2 of the United States Constitution. Second, if so, whether this court must establish a new district plan if the legislature fails to do so "according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." Reynolds v. Sims, 377 U.S. 533, 586 (1964). We answer the first question in the affirmative. In answering the second question, we determine that, upon a demonstrated legislative impasse, this court must establish a new district plan and, in doing so, we will apply the "least change" approach.

I. Procedural Background

The plaintiffs, Theresa Norelli, Christine Fajardo, Matt Gerding, and Palana Hunt-Hawkins, filed a complaint against the Secretary of State in superior court challenging the constitutionality of New Hampshire's current congressional districts, see RSA 662:1. The plaintiffs contend that these

2

districts have been rendered unconstitutionally malapportioned due to population shifts reported by the United States Census Bureau's 2020 census.

The complaint alleges that, in January 2022, the New Hampshire House of Representatives passed House Bill 52, which would codify a new congressional district plan. According to the plaintiffs, the Governor has stated that he will veto the bill, and "there is no indication the General Court is interested in compromising with the Governor on this issue." Therefore, they contend, "there is now little reason to believe that the members of the General Court will enact a map that [the Governor] finds acceptable."

The complaint states that, in 2020, the Census Bureau conducted the decennial census required by Article I, Section 2 of the Federal Constitution and, in August 2021, delivered to New Hampshire its redistricting data file containing the census results. According to the complaint, New Hampshire's resident population is 1,377,529 — an increase over the results of the 2010 census reporting that New Hampshire had a population of 1,316,470. Relying on data contained in the 2010 and 2020 Census Bureau data files, the plaintiffs allege that "population shifts since 2010 have rendered New Hampshire's First Congressional District significantly overpopulated and the Second Congressional District significantly underpopulated." Thus, the plaintiffs assert, "the existing configuration of New Hampshire's congressional districts is unconstitutionally malapportioned," and, if used in future elections, the plaintiffs' "votes will be unconstitutionally diluted because the First Congressional District, where [they] live, has a population that is significantly larger than the Second Congressional District." The plaintiffs seek a declaration that the existing congressional districting statute is unconstitutional and request that the court establish a new district plan.

On April 11, 2022, this court invoked its supervisory jurisdiction, ordered the clerk of the superior court to transfer the record of the proceedings, and assumed jurisdiction over the case to the exclusion of the superior court. We took such actions "because the case is one in which 'the parties desire, and the public need requires, a speedy determination of the important issues in controversy.'" (Quoting Monier v. Gallen, 122 N.H. 474, 476 (1982) (brackets omitted)). In doing so, we noted that "[o]ur invocation of jurisdiction over this case in no way precludes the legislature from enacting a redistricting plan," and that we "will terminate this proceeding" if a congressional redistricting plan "is validly enacted at any time prior to the close of this case."

Because the filing period for declarations of congressional candidacy runs from June 1 through June 10, 2022, see RSA 655:14 (2016) — absent any extension of that filing period by the Secretary of State, see RSA 655:14-c (2016) — and because the primary election will take place on September 13, 2022, see RSA 653:8 (2016); RSA 652:5 (2016), we determined that the court "must take certain preliminary steps in this case now so that, in

the event that the legislative process fails to produce a fully enacted congressional redistricting plan, we will be prepared to resolve the case in a thorough and efficient manner." Accordingly, we ordered that, no later than April 25, 2022, interested parties and any person seeking to participate as an intervenor or amicus curiae file briefs addressing preliminary issues, including the constitutionality of the existing congressional districts and whether the "least change" approach is the correct approach for the court to apply to any court-ordered congressional redistricting plan.

On April 21, 2022, we joined the State of New Hampshire as a defendant and ordered it to inform this court as to whether it disputes the numerical entries in the table contained in the plaintiffs' complaint and reproduced below. The plaintiffs' complaint alleges that the information contained in the table is "generated from the P.L. 94-171 data files provided by the Census Bureau in 2010 and 2020."

| District | 2010 Population | 2020 Population | Shift from 2010 to 2020 | Deviation from Ideal 2020 Population | Percent Deviation |
|----------|-----------------|-----------------|-------------------------|--------------------------------------|-------------------|
| 1 | 658,233 | 697,737 | +39,504 | +8,972 | 1.3% |
| 2 | 658,237 | 679,792 | +21,555 | -8,973 | -1.3% |

The State notified the court that it does not dispute any of the numerical entries contained in the table.

On May 4, 2022, we heard oral argument on the preliminary issues. After consideration of the written submissions and oral arguments, we rule as follows.

II. Analysis

A. Subject Matter Jurisdiction

We begin our analysis by addressing challenges to our subject matter jurisdiction. The Speaker of the New Hampshire House of Representatives and the President of the New Hampshire Senate (the intervenors) first argue that this court lacks authority to act because "redistricting is an inherently political function that is incompatible with the independent and neutral role of the judiciary." (Capitalizations and bolding omitted.) We disagree. A claim that a population disparity between congressional districts unconstitutionally dilutes a plaintiff's vote is justiciable. See Wesberry v. Sanders, 376 U.S. 1, 5-7 (1964).

4

The intervenors, together with the State, further argue that this court is precluded by the "times, places, and manner" provision of the Federal Constitution from <u>any</u> role in the congressional redistricting process. <u>See</u> U.S. CONST. art. I, § 4 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."). Under their view, that provision of the Federal Constitution vests authority over the congressional redistricting process exclusively in the state legislature, with federal courts having exclusive jurisdiction over any lawsuit involving the constitutionality of the state legislature's congressional districting plan. The intervenors and the State claim to find support for that proposition in Justice Alito's dissent in <u>Moore v. Harper</u>, 142 S. Ct. 1089 (2022) (Alito, J., dissenting from Court's denial of application for stay). In that case, Justice Alito, joined by Justices Thomas and Gorsuch, urged the Court to grant certiorari to determine "the <u>extent</u> of a state court's authority to reject rules adopted by a state legislature for use in conducting federal elections," <u>id</u>. at 1089 (emphasis added), and maintained that "there must be <u>some</u> limit on the authority of state courts to countermand actions taken by state legislatures when they are prescribing rules for the conduct of federal elections," <u>id</u>. at 1091.

We are not persuaded by the State and the intervenors' jurisdictional argument. Their argument is contrary to the Supreme Court's unanimous opinion in <u>Growe v. Emison</u>, 507 U.S. 25 (1993), which is controlling authority in support of state court jurisdiction in congressional redistricting cases. We are obligated to follow the controlling authority established in <u>Growe</u>. <u>See</u> <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997) ("We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (quotation and brackets omitted)).

The <u>Growe</u> Court unanimously held that "state courts have a significant role in [congressional] redistricting." <u>Growe</u>, 507 U.S. at 33, 34. In <u>Growe</u>, a group of plaintiffs sued in state court in Minnesota in January 1991, claiming, in part, that the 1990 federal census results rendered the then-existing congressional districts unconstitutionally malapportioned. <u>Id</u>. at 27. In February, the Minnesota Supreme Court appointed a special redistricting panel to preside over the case. <u>Id</u>. at 27-28. In March, different plaintiffs sued in federal district court, raising a similar challenge to the congressional districts. <u>Id</u>. at 28. By January 1992, the Minnesota legislature had not enacted a lawfully valid congressional redistricting plan and the Minnesota Supreme Court initiated a process to develop its own redistricting plan. <u>Id</u>. at 29-30. In February, two days after the state court held hearings on the redistricting plans submitted by the parties, the federal district court issued an order adopting its own congressional redistricting plan and permanently enjoining any state judicial or

legislative interference with that plan. <u>Id</u>. at 30-31. In early March, the state court "indicated that it was fully prepared to release a congressional plan but that the federal injunction prevented it from doing so." <u>Id</u>. at 31 (quotation omitted).

On appeal, the United States Supreme Court ruled that, because the state court was "fully prepared" to adopt a congressional plan in time for the primary elections, the federal district court "erred in not deferring to the state court's timely consideration of congressional reapportionment." <u>Id</u>. at 37. The Court explained that "[t]he power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged." <u>Id</u>. at 33 (quotation omitted).

The intervenors attempt to counter the force of <u>Growe</u> by arguing that the state court's jurisdiction over the congressional redistricting case there was simply assumed, not decided. We are unpersuaded by that argument because we cannot conclude that the unanimous Supreme Court in <u>Growe</u> overlooked a basic jurisdictional tenet. <u>See</u> <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 514 (2006) ("[C]ourts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."). The intervenors' argument also fails to account for the Supreme Court's post-<u>Growe</u> decision in <u>Branch v. Smith</u>, 538 U.S. 254 (2003), which endorsed the role of <u>state</u> courts in congressional redistricting pursuant to a still-effective federal statute — enacted under Congress's Article I, Section 4 power — providing for the "'establish[ment] by law [of] a number of districts equal to the number of Representatives to which such State is so entitled.'" <u>Branch</u>, 538 U.S. at 267 (quoting 2 U.S.C. § 2c). The <u>Branch</u> Court explained that while the federal statutory language "assuredly envisions legislative action, it also embraces action by state and federal courts when the prescribed legislative action has not been forthcoming." <u>Id</u>. at 272 (concluding that, "[i]n sum, [the statutory language] is as readily enforced by courts as it is by state legislatures, and is just as binding on courts—federal or state—as it is on legislatures").

Our interpretation of <u>Growe</u> is consistent with numerous state court decisions addressing congressional redistricting. <u>See, e.g.</u>, <u>Hippert v. Ritchie</u>, 813 N.W.2d 391, 395 (Minn. 2012); <u>Perrin v. Kitzhaber</u>, 83 P.3d 368, 370 n.2 (Or. Ct. App. 2004); <u>Alexander v. Taylor</u>, 51 P.3d 1204, 1207-10 (Okla. 2002); <u>Brown v. Butterworth</u>, 831 So. 2d 683, 688-89 (Fla. Dist. Ct. App. 2002); <u>Perry v. Del Rio</u>, 67 S.W.3d 85, 88 (Tex. 2001). Within the past year, at least five state supreme courts have decided congressional redistricting cases after legislative efforts were unsuccessful. <u>See</u> <u>Johnson v. Wisconsin Elections Comm'n</u>, 971 N.W.2d 402 (Wis.), <u>stay denied sub nom.</u> <u>Grothman v. Wisconsin Elections Comm'n</u>, 142 S. Ct. 1410 (2022) (order in no. 21A490 denying application for stay as to congressional redistricting), <u>rev'd in part on other grounds sub nom.</u> <u>Wisconsin Legislature v. Wisconsin Elections Comm'n</u>, 142 S. Ct. 1245 (2022)

(per curiam) (reversing as to redistricting of state legislature only); Carter v. Chapman, 270 A.3d 444 (Pa. 2022); Wattson v. Simon, 970 N.W.2d 56 (Minn. 2022); In re Reapportionment Comm'n, 268 A.3d 1185 (Conn. 2022) (per curiam); In re Decennial Redistricting, (Va. decided Dec. 28, 2021, available at https://www.vacourts.gov/courts/scv/districting/redistricting_final.pdf (last visited May 11, 2022).

We hold that this court has jurisdiction to rule on the constitutionality of RSA 662:1, and to formulate a remedy if the current congressional districting statute is unconstitutional and no redistricting plan is timely enacted by the legislature. Our involvement is not foreclosed by Article I, Section 4 of the Federal Constitution. See Branch, 538 U.S. at 266-67, 272. Indeed, "Federal law is enforceable in state courts . . . because the Constitution and laws passed pursuant to it are as much laws in the States as laws passed by the state legislature." Howlett v. Rose, 496 U.S. 356, 367 (1990). "The Supremacy Clause makes those laws 'the supreme Law of the Land,' and charges state courts with a coordinate responsibility to enforce that law . . . ." Id. The Supreme Court has determined that the state legislature's "power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote." Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217 (1986). As the Court reasoned in Wesberry, "nothing in the language of Art. I, § 4 gives support to a construction that would immunize state congressional apportionment laws which debase a citizen's right to vote from the power of courts to protect the constitutional rights of individuals from legislative destruction." Wesberry, 376 U.S. at 6-7.

    B. Constitutionality of RSA 662:1

The plaintiffs' complaint relies upon both the State Constitution and the United States Constitution in challenging the congressional districts as established in RSA 662:1. The State and the intervenors contend that congressional districting is a matter governed exclusively by the United States Constitution. In this case, we will analyze and decide the preliminary questions under the Federal Constitution. Cf. State v. Ball, 124 N.H. 226, 231-33 (1983) (when it is undisputed that the protections of the New Hampshire Constitution are implicated in a particular case, "we will first examine the New Hampshire Constitution and only then, if we find no protected rights thereunder, will we examine the Federal Constitution to determine whether it provides greater protection"). We acknowledge that Ball generally counsels in favor of a different approach to decision-making, but the following reasons persuade us to depart from that approach here.

First, as the citations in the dissenting position articulated in Moore, 142 S. Ct. at 1089-90, indicate, there is some debate as to "whether the Elections or Electors Clauses of the United States Constitution, Art. I, § 4, cl. 1; Art. II, § 1, cl. 2, are violated when a state court holds that a state constitutional provision

7

overrides a state statute governing the manner in which a federal election is to be conducted." Republican Party of Pennsylvania v. Degraffenreid, 141 S. Ct. 732, 738 (2021) (Alito, J., dissenting from denial of certiorari) (emphasis added). "In keeping with our long-standing policy not to decide questions of a constitutional nature unless absolutely necessary to a decision of the case," State v. Berrocales, 141 N.H. 262, 264 (1996) (quotation omitted), we do not engage in a State constitutional analysis here because it would otherwise involve us in a threshold determination of federal constitutional law. Second, an independent analysis under the State Constitution is unnecessary because the United States Constitution provides the protections sought by the plaintiffs. See State v. Bertrand, 133 N.H. 843, 850 (1991); see also State v. Kellenbeck, 124 N.H. 760, 766-67 (1984) (Souter, J., concurring).

Having determined that we will decide this case solely under the Federal Constitution, we now set forth the relevant legal principles bearing on the constitutionality of RSA 662:1. Article I, Section 2 of the Federal Constitution provides that the United States House of Representatives "shall be composed of Members chosen every second Year by the People of the several States," and that such Representatives "shall be apportioned among the several States . . . according to their respective Numbers." U.S. CONST. art. I, § 2. The United States Supreme Court interprets that provision to mean that, "as nearly as is practicable, one [person's] vote in a congressional election is to be worth as much as another's." Wesberry, 376 U.S. at 7-8, 17-18. Article I, Section 2 establishes a "high standard of justice and common sense" for the apportionment of congressional districts: "equal representation for equal numbers of people." Id. at 18.

To comply with that high standard, "States must draw congressional districts with populations as close to perfect equality as possible." Evenwel v. Abbott, 578 U.S. 54, 59 (2016); see Karcher v. Daggett, 462 U.S. 725, 732 (1983) (explaining that "absolute population equality [is] the paramount objective"). "The 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality." Karcher, 462 U.S. at 730 (quotation and brackets omitted). "Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." Id. (quotation omitted). Article I, Section 2, therefore, "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." Id. (quotation omitted). "Adopting any standard other than population equality, using the best census data available, would subtly erode the Constitution's ideal of equal representation." Id. at 731 (citation omitted).

The Supreme Court employs a two-prong test to determine whether a state's congressional districting plan meets the "as nearly as practicable" standard. See id. at 730-31. First, the parties challenging the plan bear the

burden of proving the existence of population differences which "could practicably be avoided" by "a good-faith effort to achieve equality." Id. at 730-31, 734. If they do so, the burden shifts to the State to "show with some specificity" that the population differences are "necessary to achieve some legitimate state objective." Id. at 740-41. This burden is a "flexible" one, which "depend[s] on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population more closely." Id. at 741. "By necessity, whether deviations are justified requires case-by-case attention to these factors." Id.

"Any number of consistently applied legislative policies might justify" minor population deviations, including "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." Id. at 740. However, there are "no de minimis population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2, without justification." Id. at 734; see Tennant v. Jefferson County Comm'n, 567 U.S. 758, 762-65 (2012) (per curiam) (upholding a congressional redistricting plan with a population variance of 0.79% because the state met its burden of demonstrating that the population deviations were necessary to achieve the legitimate objectives of not splitting counties, preserving the core of existing districts, and preventing contests between incumbents); Karcher, 462 U.S. at 732, 744 (striking down a congressional districting plan with population deviations of approximately 0.7% because the plan was not a good-faith effort to achieve population equality using the best available census data and the state's attempts to justify the deviations were not supported by the evidence).

A census must be taken every ten years for the purpose of apportioning the United States House of Representatives. See U.S. CONST. art. I, § 2, cl. 3. Despite the reality that "population counts for particular localities are outdated long before they are completed," because "the census count represents the best population data available, it is the only basis for good-faith attempts to achieve population equality." Karcher, 462 U.S. at 732, 738 (quotation and citation omitted); cf. Abrams v. Johnson, 521 U.S. 74, 100-01 (1997) (rejecting a challenge to a court-ordered congressional redistricting plan mid-way between two decennial censuses).

In this case, the plaintiffs assert that the population shifts which have occurred in New Hampshire since the 2010 census render the current congressional districting statute unconstitutional in violation of the one-person, one-vote principle. Given that the "current district lines were drawn using decade-old census data," the plaintiffs assert that "any justification for the current district lines that might have existed 10 years ago is obsolete." Thus, they contend, there "is no justification" for the resulting deviation of 2.6%.

9

The State does not dispute that the current deviation between the districts is 2.6%, and that the deviation equates to 17,945 additional people in the First Congressional District as compared to the Second Congressional District. In addition, the State concedes that it "can identify no precedent holding that a 2.6 percent deviation [in population equality between districts] . . . is within [the] constitutionally acceptable margin" for a congressional district plan.

Given that the current census-based population deviation reflects a "real difference[] [between] the districts," it is clear that the deviation can be "avoided or significantly reduced with a good-faith effort to achieve population equality" by redistricting the current congressional districts based upon the 2020 census. Karcher, 462 U.S. at 738. Indeed, the State asserts that achieving population equality in this case "would likely require that only a small number of political subdivisions—and perhaps only one—be moved from one congressional district to another."

Nonetheless, the intervenors argue that because, in Below v. Secretary of State, 148 N.H. 1 (2002) (Below I), this court "drew State Senate Districts with a 4.96% deviation," a deviation of 2.6% in this case "is not facially offensive to the doctrine of one [person], one vote." This argument disregards the fundamental differences between the standards that apply to congressional redistricting under Article I, Section 2, and state senate redistricting under the Fourteenth Amendment. "[W]hereas population alone has been the sole criterion of constitutionality in congressional redistricting under Art. I, § 2, broader latitude has been afforded the States under the Equal Protection Clause in state legislative redistricting . . . ." Mahan v. Howell, 410 U.S. 315, 322 (1973); see also White v. Regester, 412 U.S. 755, 763 (1973); Reynolds, 377 U.S. at 579; Voinovich v. Quilter, 507 U.S. 146, 161 (1993). This broader latitude simply does not apply to congressional districts, where "absolute population equality [is] the paramount objective." Karcher, 462 U.S. at 732; Kirkpatrick v. Preisler, 394 U.S. 526, 530-31 (1969). Additionally, to the extent the State asserts that Levitt v. Maynard, 105 N.H. 447 (1964), justifies allowing a 2.6% deviation to stand, the Levitt Court's statement that congressional redistricting is not held to a "strict[er] standard" is no longer correct. Levitt, 105 N.H. at 450; see Karcher, 462 U.S. at 730-32; Kirkpatrick, 394 U.S. at 530-31.

Accordingly, we determine that, under the first prong of the Karcher test, the plaintiffs have met their burden of proving the existence of population differences that "could practicably be avoided." Id. at 734. Therefore, the burden shifts to the State to "show with some specificity" that the population differences are "necessary to achieve some legitimate state objective." Id. at 740-41. Here, the "interest" asserted by the State is that this court should not act too soon, and should give the legislature "every opportunity to complete its federal and state constitutional obligations to legislate a congressional

10

reapportionment." Our April 11, 2022 order expressly acknowledges that the legislature continues to have that opportunity and that we "will terminate this proceeding" if a congressional redistricting plan "is validly enacted at any time prior to the close of this case." However, as the Supreme Court has recognized, a constitutional redistricting plan, including one drawn by a state supreme court, must be adopted "within ample time to permit such plan to be utilized in the [upcoming] election," in accordance with the provisions of the state's election laws. Scott v. Germano, 381 U.S. 407, 409 (1965) (per curiam).

Moreover, the State's asserted interest does not answer the question why the 2.6% deviation is necessary to achieve some legitimate state objective. Although the State notes in passing that "the present congressional maps implicate the significant state interests of consistency, compactness, preservation of political subdivision boundaries, conservation of prior district lines, and avoidance of contests between incumbents," it does not assert, nor can it, that the legislature has made a considered judgment in affirmatively deviating in population equality between the districts by 2.6%. Here, there is no legislative purpose to the current population deviation — it is simply the result of population growth and movement within the state between the 2010 and 2020 censuses.

Accordingly, we determine that, under the second prong of the Karcher test, the State has failed to show that the population differences between the existing congressional districts are "necessary to achieve some legitimate state objective." Karcher, 462 U.S. at 740. Thus, we hold that the existing congressional districting statute, RSA 662:1, violates Article I, Section 2 of the United States Constitution.

C. Remedy

Having determined that the current congressional districting statute is unconstitutional, see RSA 662:1, we address whether this court must establish a new plan if the legislature fails to do so. At the outset, the State argues that the principle that federal courts should not ordinarily enjoin a state's election laws in the days preceding an election "warns against judicial intervention in the present case." According to the State, this principle "delivers a clear directive" that this court "not intervene to alter New Hampshire's congressional maps." The cases cited by the State, however, advise in favor of resolving this case in a timely and efficient manner so as not to disrupt the upcoming election process. See, e.g., Purcell v. Gonzalez, 549 U.S. 1, 4-6 (2006) (per curiam) (vacating an order — issued "just weeks before an election" — enjoining operation of Arizona voter identification procedures given "the imminence of the election and the inadequate time to resolve" the "hotly contested" factual disputes in the underlying case; noting that the risk of voter confusion will increase as an election draws closer); Republican Nat. Comm. v. Democratic Nat. Comm., 140 S. Ct. 1205, 1206-07 (2020) (per curiam) (staying

11

a court order, issued five days before the scheduled election, that enjoined state law requiring absentee voters to return their ballots no later than election day).

We reject the State's position that, despite the unconstitutionality of the current congressional districting statute, judicial non-intervention in this case is more important than protecting the voters' fundamental rights under the United States Constitution. See Wesberry, 376 U.S. at 8 (observing that "[i]t would be extraordinary to suggest that" statewide elections ought to proceed despite the fact that the votes of citizens of some parts of a state would "be weighted at two or three times the value of the votes of people living in more populous parts" of the state). It is the duty of the judiciary to protect constitutional rights and, in doing so, "to support the fundamentals on which the Constitution itself rests." Trustees & c. Academy v. Exeter, 90 N.H. 472, 487 (1940); see Howlett, 496 U.S. at 367.

Counsel for the Secretary of State informs the court that any new congressional district plan needs to be in place by June 1, 2022 for the filing period that commences on that date, absent an extension. See RSA 655:14. Given "the necessity for clear guidance to" the State of New Hampshire, Purcell, 549 U.S. at 5, we are "fully prepared to adopt a congressional plan in [a] timely . . . manner" to ensure that the upcoming election proceeds in conformity with law. See Growe, 507 U.S. at 37. Accordingly, we next address what approach we will take in formulating a new district plan.

In the context of state legislative redistricting, we have observed that "[r]eapportionment is primarily a matter of legislative consideration and determination." Below I, 148 N.H. at 5 (quotation omitted); see also Reynolds, 377 U.S. at 586. "'A state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality.'" Below I, 148 N.H. at 5 (quoting Connor v. Finch, 431 U.S. 407, 414-15 (1977)). Thus, in Below I, when we undertook the "unwelcome obligation of performing in the legislature's stead" to draw new state senate districts, we observed that we "possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name," and concluded that, therefore, we must accomplish our task "circumspectly, and in a manner free from any taint of arbitrariness or discrimination." Below I, 148 N.H. at 5, 9 (quotations omitted).

We also noted that, unlike legislatures, courts engaged in redistricting are held to a higher standard of achieving population equality, explaining that "[t]he latitude in court-ordered plans to depart from population equality" is "considerably narrower than that accorded apportionments devised by state legislatures, and the burden of articulating special reasons for following a state policy in the face of substantial population inequalities is correspondingly

12

higher." Id. at 8 (quotations, ellipses, and brackets omitted); see also Abrams, 521 U.S. at 98 (observing, in the context of congressional redistricting, that "absolute population equality is the paramount objective," that "[c]ourt-ordered districts are held to higher standards of population equality than legislative ones," and that "[a] court-ordered plan should ordinarily achieve the goal of population equality with little more than de minimis variation" (quotations and brackets omitted)).

Accordingly, we expressly adopted the "least change" approach in devising new court-drawn state senate districts, and held that our task was simply to "remedy the constitutional deficiencies in the existing senate districts." Below I, 148 N.H. at 13-14; see also Upham v. Seamon, 456 U.S. 37, 43 (1982) (per curiam) (observing that courts' modifications to redistricting plans "are limited to those necessary to cure any constitutional or statutory defect"). In doing so, we stated that we would be guided primarily by the constitutional principle of one-person, one-vote, and that we would "use as our benchmark the existing senate districts" because the existing district plan was "the last validly enacted plan," "the clearest expression of the legislature's intent," and "the best evidence of State redistricting policy." Id. at 13; see also Colleton County Council v. McConnell, 201 F. Supp. 2d 618, 649 (D.S.C. 2002). Therefore, we sought to ensure, "to the greatest extent practicable, that each senatorial district contain[ed] roughly the same constituents as the last validly enacted plan," and determined that, "to remedy the population deviations in existing districts, it [was] preferable that the core of those districts be maintained, while contiguous populations [be] added or subtracted as necessary to correct the population deviations." Below I, 148 N.H. at 13 (emphasis omitted).

Here, the parties agree that "least change" is the correct approach for this court to apply in devising a congressional redistricting plan. Given that the foregoing principles — describing our limited judicial role in drawing state legislative districts — apply with as much, if not more, force in the context of congressional redistricting, we likewise agree. See Karcher, 462 U.S. at 732-34 (explaining that "the command of Art. I, § 2, as regards the National Legislature outweighs the local interests that a State may deem relevant in apportioning districts for representatives to state and local legislatures," and that "there are no de minimis population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2, without justification"). Accordingly, any congressional redistricting plan that we may adopt will reflect the least change necessary to remedy the constitutional deficiencies in the existing congressional districts.

We note that our decision to apply the "least change" approach is in accord with those of several other jurisdictions that have addressed this question. For example, the Wisconsin Supreme Court recently applied the "least change" approach in devising its own congressional redistricting plan.

13

See Johnson v. Wisconsin Elections Comm'n, 967 N.W.2d 469, 488-92 (Wis. 2021).  The court explained that "[a] least-change approach is nothing more than a convenient way to describe the judiciary's properly limited role in redistricting," and determined that any court-ordered plan "should reflect the least change necessary for the maps to comport with relevant legal requirements."  Id. at 490 (quotation omitted).  The court observed that the "least change" approach — or "minimum change doctrine" — is "far from a novel idea," has been "applied in numerous cases," and is "general[ly] accept[ed] among reasonable jurists."  Id.; see, e.g., Carter, 270 A.3d at 464; In re Reapportionment Comm'n, 268 A.3d at 1185; Hippert, 813 N.W.2d at 397-98; Alexander, 51 P.3d at 1211-12.

As in Below I, we will be guided primarily by the constitutional principle of one-person, one-vote, and we will use as our benchmark the existing congressional districts because the district plan enacted in 2012 is "the last validly enacted plan," "the clearest expression of the legislature's intent," and "the best evidence of State redistricting policy."  Below I, 148 N.H. at 13 (quotation omitted).  Further, we will adhere to the "least change" principles that, to the greatest extent practicable, each district should contain roughly the same constituents as the last validly enacted plan, and that it is preferable that the core of the districts be maintained, while contiguous populations are added or subtracted as necessary to correct the population deviations.  See id.

Additionally, New Hampshire has historically avoided dividing towns, city wards, or unincorporated places unless they have previously requested to be divided by referendum.  See id.; Burling v. Speaker of the House, 148 N.H. 143, 152 (2002); N.H. CONST. pt. II, arts. 9, 11, 11-a, 26 (mandating the application of these policies in the state legislative redistricting context).  We discern the same policies in prior legislative enactments governing congressional redistricting.  See, e.g., Laws 2012, 18:1 (congressional redistricting following 2010 census); Laws 2002, 32:1 (congressional redistricting following 2000 census); Laws 1992, 15:1 (congressional redistricting following 1990 census).  Accordingly, any plan we adopt will reflect such historic redistricting policies to the greatest extent practicable so long as they are consistent with the "least change" approach to achieving congressional districts with populations as close to perfect equality as possible.  See Evenwel, 578 U.S. at 59-60; Abrams, 521 U.S. at 98; Karcher, 462 U.S. at 730-33.

Political considerations "have no place in a court-ordered remedial [redistricting] plan."  Below I, 148 N.H. at 11; Burling, 148 N.H. at 156; see also Connor, 431 U.S. at 415 (observing that court-drawn redistricting must be "free from any taint of arbitrariness or discrimination" (quotation omitted)).  We acknowledge, as the intervenors assert, that any change to the existing congressional districts may have political ramifications.  However, that is why "least change" is the best approach for this court to take in devising a congressional redistricting plan that will remedy the existing constitutional

deficiencies.  See, e.g., Johnson, 967 N.W.2d at 492 ("While the application of neutral standards inevitably benefits one side or the other in any case, it does not place our thumb on any partisan scale . . . .").  Here, any incidental political ramifications that may result would be the consequence of the fact that the legislature did not "reapportion according to constitutional requisites in a timely fashion."  Petition of Below, 151 N.H. 135, 137 (2004) (quotation omitted).

III. Conclusion

This court has both the authority and the obligation to ensure that the upcoming election proceeds under a legally valid congressional district plan. We conclude that changes in New Hampshire's population, as reflected in the 2020 census and undisputed by the parties, have rendered the existing congressional districting statute, RSA 662:1, unconstitutional in violation of Article I, Section 2 of the United States Constitution.  Accordingly, we will take the necessary steps to formulate a district plan that complies with all applicable laws in order to protect the fundamental rights of New Hampshire voters.  We reiterate that the legislature is not precluded from enacting a legally valid congressional district plan at any time prior to the close of this case.

So ordered.

MACDONALD, C.J., and HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

15